REQUESTED BY: Merton L. ("Cap") Dierks, Nebraska State Senator
We have received your request for an opinion on two questions. First, when does preemption of federal livestock price reporting laws over our own state livestock price reporting statute begin and, second, what effect would a change in the implementation date of our state livestock price reporting statute have on the federal livestock price reporting scheme? In response to producer concerns, the 1999 Nebraska Legislature passed the "Nebraska Competitive Livestock Markets Act," which became law immediately after the Governor's signature on May 26, 1999. Neb. Rev. Stat. §§ 54-2601 to 54-2631. Soon after, the United States Congress passed the "Livestock Mandatory Reporting Act of 1999" as Title IX of the Agriculture Appropriations Act, H.R. 1906. Both of these statutory schemes contain requirements for meat packers, including the reporting of prices paid to livestock sellers.
 I. Timing of Preemption
Your first question of when the "Nebraska Competitive Livestock Markets Act" is preempted by the Federal "Livestock Mandatory Reporting Act of 1999" relates to pending legislation, namely LB 833, so our office can provide you an opinion upon the effect of changes on the "Nebraska Competitive Livestock Markets Act." The "Nebraska Competitive Livestock Markets Act" (hereinafter "the Nebraska Act") became law on May 26, 1999, as 1999 Neb. Laws LB 835. It had requirements relating to packer ownership of livestock that were operational immediately, while the price discrimination prohibition, contract term requirements and price reporting requirements were not operational until February 15, 2000. Op. Att'y Gen. No. 99028 (July 16, 1999). In November 1999, the Nebraska Department of Agriculture requested an opinion from our office on the preemptive effect of the "Livestock Mandatory Reporting Act of 1999" (hereinafter "the Federal Act") over the Nebraska Act. The Federal Act was signed into law on October 22, 1999, by President Clinton. We essentially stated that the Federal Act's broad preemptive provisions on price reporting directly preempted the Nebraska Act's price reporting requirements. Op. Att'y Gen. No. 99051 (November 30, 1999). Further, the Nebraska Act's price reporting scheme was so integrally related to it's price discrimination and contracting requirements, that the price discrimination and contracting requirements were also preempted. Id. The prohibition on packer ownership of livestock was not preempted, as the federal law does not address ownership of livestock. Id. There appears to be some confusion surrounding the timing of preemption by the Federal Act over the State Act.
The United States Department of Agriculture (hereinafter "the USDA") was apparently contacted by members of the U.S. Senate to define the beginning date for preemption of the Federal Act over several state livestock price reporting acts. In response, the USDA General Counsel described the USDA's duties as beginning upon implementation of the Federal Act. The USDA further took the position that state livestock reporting requirements are not preempted until the USDA implements it's own price reporting scheme. If this were true, then the Nebraska Act would require the Nebraska Department of Agriculture to begin collecting data from Nebraska meat packers on February 15, 2000, and creating reports of this data. This state reporting scheme would operate until the Federal Act is implemented by final regulations promulgated by the USDA. Implementation of the federal price reporting scheme should begin around April 20, 2000, according to the required dates for implementation under H.R. 1906, Title IX, § 941. This places the Nebraska Department of Agriculture in the unique position of having a fully operational price reporting system for approximately two months.
The beginning of preemption of the Nebraska Act by the Federal Act must be determined from the language of the Federal Act. The first step is to review Title IX of H.R. 1906 to determine it's enactment and implementation dates. The preemption clause, Section 259, which mentions no specific timing for preemption, is contained in "Chapter 5 — Administration" and states:
 In order to achieve the goals, purposes and objectives of this title on a nationwide basis and to avoid potentially conflicting State laws that could impede the goals, purposes and objectives of this title, no State or political subdivision of a State may impose a requirement that is in addition to, or inconsistent with, any requirement of this subtitle with respect to the submission or reporting of information, or the publication of such information, on the prices and quantities of livestock or livestock products.
H.R. 1906, Title IX, § 259.
While the Federal Act does state an intent to preempt, it should also state when this preemption clause is enacted. H.R. 1906 begins with the phrase "Be it enacted by the Senate and House of Representatives . . . that. . . ." H.R. 1906 Preamble. This phrase is defined to be the "enacting clause" of a statute.Blacks Law Dictionary 526 (6th Ed. 1990). This clause signifies the fact the bill becomes law upon the President's signature. "Every Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of the United States; If he approves it he shall sign it . . ." U.S. Const. Sec. 7, cl. 2. The U.S. Supreme Court has defined the point in time that a law is formed. "The date of the President's approval of a bill is undoubtedly the date at which it became a law." Gardner v. Collector, 73 U.S. 499, 6 Wall 499, 18 L. Ed. 890 (1879). Since President Clinton signed this bill, it's "enactment" occurred when the bill became a law.Blacks Law Dictionary 526 (6th Ed. 1990). However, other than the enacting clause mentioned, H.R. 1906 does not state any other timing requirements for it's preemption clause under Title IX, § 259. The enactment clause is the beginning of the law's authority, and all sections after it, including § 259, are operational at that point. In defining "enactment," courts have stated that a statute " . . . must be interpreted to indicate a beginning point . . . (the date the President signed the bill into law) from which the Act and its amendments would be operative on events coming within their scope . . ." Patterson v. McLean CreditUnion, 784 F.Supp. 268, 274 (M.D. N.C. 1992). Since the enactment clause appears to be the only mention in the Federal Act making the law operational, then the lack of contrary language would confirm operation of the entire law upon enactment. "As in any case of statutory construction, our analysis begins with `the language of the statute.' And where the statutory language provides a clear answer, it ends there as well." Hughes AircraftCo. v. Jacobson, 525 U.S. 432, 119 S. Ct. 755, 760, ___ L. Ed. 2d ___ (1999) (citations omitted). The Federal Act's operational sections include § 259.
Since the Federal Act's preemption clause is operational, it must be determined at what point in time this preemption takes effect. The Federal Act's preemptive effect is dependent upon the Supremacy Clause of the U.S. Constitution. U.S. Const. art. VI, cl. 2. "Express preemption occurs when Congress, in enacting a federal statute, announces a clear intent to preempt state law."Colorado Public Utilities Com'n v. Harmon, 951 F.2d 1571, 1576
(10th Cir. 1991), citing Jones v. Rath Packing Co., 430 U.S. 519,97 S. Ct. 1305, 51 L. Ed. 2d 604 (1977). Congress' intent to preempt the State Act appears to begin on the enactment date for § 259 of H.R. 1906, Title IX.
The intent to preempt is clear, the § 259 preemption clause was operational upon enactment, but the date at which preemption begins must be determined. The USDA's duties do not begin until price reporting regulations are implemented, at which time ". . . the Secretary of Agriculture shall publish final regulations to implement this title and the amendments made by this title." HR 1906, Title IX., § 941(a). While the USDA's reporting duties won't begin until nearly 180 days past the enactment date, this does not mean that the federal statute does not preempt until the USDA's regulatory duties begin. The Federal Act must specifically state it is delaying preemption.
An analysis of other federal laws shows language for delayed preemption must be expressed, if the intent is to delay implementation and preemption of federal regulatory schemes. In discussing the preemption clause for the former Federal Railroad Safety Act ("FRSA"), now codified at 49 U.S.C.A. § 20106, the 10th
Circuit Court of Appeals stated: ". . . we begin our analysis by agreeing with the district court that § 434 of the FRSA states an express preemption of state law. We also agree preemption does not occur until the Secretary adopts a rule, regulation, or standard covering the subject matter of the state law." Hatfieldv. Burlington Northern R.Co., 958 F.2d 320, 321 (10th
Cir. 1992). The FRSA expressly allowed the States to continue their own laws until the Secretary of Transportation adopted regulations in that area. In particular, the former FRSA stated:
. . . The Congress declares that laws, rules, regulations, orders and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order or standard relating to railroad safety until such time as the Secretary has a adopted a rule, regulation, order or standard covering the subject matter of such State requirement . . .
45 U.S.C.A. § 434 (Repealed).
The former FRSA stated preemption in this area could not begin until regulations were promulgated to effectuate preemption, as other cases have confirmed. Colorado Public Utilities Com'nv. Harmon, 951 F.2d at 1576. In an analysis of federal statutes on mooring, movement, and safety items for floating vessels, the 9th Circuit determined that similar state safety statutes were not preempted if, and until, the Secretary of Transportation promulgated regulations in that area. Beveridge v. Lewis,939 F.2d 859, 864 (9th Cir. 1991). But, the court noted,33 U.S.C.A. § 1225(b) specifically provided that states may impose higher "safety" requirements than federal law required. Id. The Secretary of Transportation had discretion to regulate under33 U.S.C.A. § 1223, allowing the agency to determine which areas would be preempted. Id. In comparison, the price reporting regulations under the Federal Act are not discretionary, as ". . . the Secretary shall publish the final regulations and implement this title . . ." HR 1906, Title IX, § 941(d). This requirement, in tandem with the clear preemption of § 259, indicates Congress was not leaving preemption up to the USDA's discretion. Further, as both Beveridge and Hatfield indicate, state statutes regulating the same subject as a federal statute can avoid preemption only if the federal statute allows them to. Unlike the statutes inBeveridge and Hatfield, HR 1906, Title IX, § 259 specifically prohibits any state law which ". . . impose[s] a requirement that is in addition to, or inconsistent with, any requirement of this subtitle. . . ." Omission of any language allowing the USDA discretion on when it would regulate (and preempt), and no mention of delayed preemption in Title IX show Congress' intent was to preempt completely, not leaving the areas of preemption up to the USDA.
Since preemption is not predicated upon the USDA regulations being issued, then Congress must have specifically provided a mechanism to delay the timing for preemption. "Congress' intent, of course, primarily is discerned from the language of the preemption statute and the `statutory framework' surrounding it."Medtronic Inc. v. Lohr, 518 U.S. 470, 116 S. Ct. 2240,135 L. Ed. 2d 700, 716 (1996). The court, as an example, cites language allowing a federal administrative agency to begin regulation, and thereby preempt, in an area that is not specifically preempted by the federal statute. Id. at 864. The USDA's analysis implies that the state laws may continue until such time as federal regulation begins, but that is not the expressed intent of the federal statute.
 The Court must assume that when Congress acts, it exercises that power and enacts supreme laws. Unless Congress itself specifically and affirmatively limits the reach of its legislation, the Court should presume that Congress is exercising its natural and supreme constitutional powers.
Gills v. Ford Motor Co., 829 F.Supp. 894, 899 (W.D. Ky. 1993). Congress would have put in language stating a delayed preemption effect if that is what it intended, just as it expressly predicated preemption upon an Agency's decision of whether to regulate or not, as described in Beveridge and Hatfield. It did not do so in HR 1906, Title IX § 259.
Preemption under the Federal Act began upon enactment of H.R. 1906. "Preemption occurs when Congress, in enacting a federal statute, expresses a clear intent to preempt state law." Norfolk Western Ry. Co. v. Public Utilities Com'n of Ohio, 926 F.2d 567,569 (6th Circuit 1991), quoting Louisiana Public Service Com'n v.FCC, 476 U.S. 355, 106 S. Ct. 1890, 90 L. Ed. 2d 369 (1986). For the reasons stated above, absence of any statutory language delaying preemption of H.R. 1906, Title IX, requires the Federal Act's provisions be given full effect upon enactment, including § 259.
 II. Delayed Implementation of the Nebraska Act
Your second question is what would be the effect of changing the implementation date of the Nebraska Act to some point beyond the likely implementation date of the Federal Act. The Nebraska Act is scheduled to begin its price reporting requirements on February 15, 2000. Neb. Rev. Stat. §§ 54-2613 54-2623. This date is prior to the expected implementation date of the Federal Act, which should be in late April, 2000. We are assuming your proposal would amend the implementation date of the Nebraska Act to a date later than the proposed implementation of the Federal Act.
Assuming this later implementation date is allowed by Nebraska law, it could be at some point beyond implementation of the Federal Act, or at some point beyond the termination of the Federal Act. H.R. 1906, Title IX does not last indefinitely. In fact, it states:
 The authority provided by this title and the amendments made by this title terminate 5 years after the date of the enactment of this Act.
HR 1906, Title IX, § 942.
Continuing our assumption Nebraska law would allow such a result, an implementation date of October 23, 2004, for the Nebraska Act would avoid the preemptive authority of the Federal Act. Further, it would continue the regulatory scheme requiring packers to report prices paid after the Federal Act expired. We must turn to the state law requirements on the enactment and implementation dates to verify that this type of amendment would be possible.
For Neb. Rev. Stat. §§ 54-2613 and 54-2623 to have delayed implementation dates, Nebraska law must not require a statute be fully operative upon enactment, i.e. an enacted statute may have sections with delayed operative dates. The Nebraska Constitution requires a law to be effective three months after adjournment of the Legislature, unless the proper "emergency clause" procedures are taken to enact the law immediately upon the Governor's signature. Neb. Const. art. III, § 27. There is no prohibition on a later operative date for a currently enacted statute. The Nebraska Supreme Court has approved enactment of statutes with delayed operative dates. When discussing the city council election statutes passed for "cities of the metropolitan class," the Court rejected the petitioners assertion that an act which had sections with delayed operative dates was unconstitutional, stating:
 It is claimed that the act is objectionable, and repugnant to the above-mentioned section of the constitution, in that different portions of it became operative at different times; that, to fulfill the requirements of the constitution, it must have become of force as a whole at the one date. We do not think the law is open to this attack.
State v. Stuht, 52 Neb. 209, 274, 71 N.W. 941, 944 (1897). The court explains that the law is constitutionally valid if it becomes operative on a fixed date, regardless of some components not being fully operational at the time it is enacted. Id. With these things in mind, the Legislature has enacted various laws with delayed operation, including the Nebraska Act discussed herein.
We do not foresee any legal challenge of a delayed operation date for Neb. Rev. Stat. §§ 54-2613 and 54-2623 being successful. A delay of the operation of these sections of the Nebraska Act is within the powers granted to the Legislature if the future operation of these sections is based upon a fixed date.
 CONCLUSION
In summation, your first question on when the Federal Act preempts the State Act turns on when the preemption clause in H.R. 1906 § 259 became operational, and what preemptive effect that clause was intended to have by Congress. Section 259 became operational upon enactment of the statute by the President's signature in October, 1999. Once operational, the preemptive effect was complete over any additional or inconsistent state price reporting laws. Since no language exists delaying that preemptive effect, preemption of the Nebraska Act occurred a the same time the Federal Act was enacted in October, 1999. The price reporting provisions in the Nebraska Act have been preempted since October, 1999.
As to your second question, on the effect of a change in the implementation date of the State Act, the State reporting requirement could simply be made operational upon the expiration of the Federal Act. Such delayed operation of an enacted statute is permissible under Nebraska law and would clearly avoid the preemptive effect of the Federal Act.
Sincerely,
 DON STENBERG Attorney General
 William R. Barger Assistant Attorney General
Approved:
Don Stenberg
Attorney General
pc: Patrick J. O'Donnell Clerk of the Legislature